UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JEFF TYLER, BRIGADIER GENERAL BOB BROOKE, and KOOTENAI COUNTY REPUBLICAN CENTRAL COMMITTEE, | Case No. 2:21-cv-00104-DCN |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| COEUR D'ALENE SCHOOL DISTRICT #271, | |
| Defendant. | |

## I.     INTRODUCTION

Pending before the Court is Plaintiffs Jeff Tyler, Brigadier General Bob Brooke, and Kootenai County Republican Central Committee's ("Plaintiffs") Motion for Preliminary and Permanent Injunction. Dkt. 2. The Court held oral argument on August 11, 2021, and took the matter under advisement.

Upon review, and for the reasons stated below, the Court DENIES the Motion for Preliminary and Permanent Injunction. Dkt. 2.

## II. STATEMENT OF FACTS

Dean Keck is the Safety and Security Coordinator for schools in the Coeur d'Alene Public School District #271 (the "District" or "Defendant"). Keck hired Deputy Nickolas Franssen from the Kootenai County Sheriff's Office to act as security at Hayden Meadows Elementary School ("Hayden Meadows") on November 3, 2020—the day of the last

presidential election. Sometime that morning, the principal at Hayden Meadows, Lisa Pica, contacted Keck and informed him there were several people in the parking lot of the school handing out materials to parents and occupying some parking spaces. Plaintiff Brooke was one of those people. The others are unknown at this juncture.

While in the parking lot, Brooke passed out sample ballots and talked to people about the election. Pica informed Keck that the electioneering "people were stopping cars that were coming into the parking lot which caused traffic to back up onto the road." Dkt. 9-1, ¶ 5. Because this was purportedly impeding parents from dropping their children off at school, Keck directed Franssen to ask the electioneers to move out of the parking lot.

What happened next is hotly disputed by the parties. Defendant contends Franssen told Brooke and the others in the parking spaces to move to a nearby grassy area so parents could get in and out of the parking lot to drop off their children. Defendant suggests "Deputy Franssen was not instructed to remove anyone from school property. No one was turned away from Hayden Meadows, and no one was ever asked to not hand out any materials or refrain from any electioneering activities." *Id.* at ¶ 11. Plaintiffs, on the other hand, contend Franssen told Brooke and the others that no electioneering was to occur anywhere on the Defendant's property and that the Defendant had a right to keep anyone off school property. Plaintiffs also allege Franssen threatened to arrest them if they did not comply.[1]

---

[1] Although Plaintiffs make this claim in their briefs, they have not offered any evidence to support it. None of the declarations filed with the Motion, including Brooke's declaration, suggest Plaintiffs were threatened with arrest. Plaintiffs did not testify at the evidentiary hearing and none of the witnesses who did—including Plaintiffs' only witness—testified that Plaintiffs were threatened with arrest.

Due to these alleged events and events from prior years when people with opposing political views were purportedly allowed to propound their views on school grounds within the District, Plaintiffs filed this lawsuit on March 8, 2021. Dkt. 1. Plaintiffs allege Defendant violated their right to freedom of speech under the First Amendment through viewpoint discrimination, their right to equal protection under the Fourteenth Amendment, and their rights under Idaho Code § 18-2318 (Idaho's campaign-free-zone election statute). *See generally* Dkt. 1. Plaintiffs filed the instant Motion for Preliminary and Permanent Injunction ("Motion") concurrently with their Complaint. Dkt. 2. In their Motion, Plaintiffs ask the Court to enjoin Defendant from preventing "Plaintiffs from engaging in electioneering efforts more than 100 feet from polling place buildings on election day on school grounds, including but not limited to: distributing sample ballots, waving signs, and peacefully interacting with voters near polling places." *Id.* at 1.

This case was initially assigned to District of Idaho Magistrate Judge Candy W. Dale; however, one of the parties chose not to file a consent form authorizing a magistrate judge to hear the case. The case was subsequently reassigned to the undersigned (Dkt. 12), and a hearing on the Motion was held on August 11, 2021. Dkt. 13. During the hearing, Plaintiffs called Thomas Hamilton, a former District Board Member who volunteered as the "constable" for the November 3, 2020 election. Dkt. 20, at 29:12–25, 30:1–24. Defendant called Pica, Keck, and Franssen. At the conclusion of the hearing, the Court directed the parties to submit their closing arguments within two weeks via simultaneous written briefs. The parties filed simultaneous closing briefs on August 25, 2021, and the Motion is now ripe for the Court's review. Dkts. 21, 22.

### III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted). The standard for a permanent injunction is essentially the same as for a preliminary injunction, with the exception that the plaintiff must show actual success on the merits rather than a likelihood of success on the merits. *Indep. Training & Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013).

Although a plaintiff seeking injunctive relief must satisfy all four of the *Winter* factors, the Ninth Circuit has affirmed a "sliding scale" approach post-*Winter*. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (citations omitted).

### IV. ANALYSIS

Before turning to the merits of the Motion, the Court first provides context for the relief Plaintiffs seek. Plaintiffs "request that this Court outline the rights of the parties under

Idaho Code § 18-2318 " and ask the Court to enjoin Defendant from preventing Plaintiffs from electioneering more than 100 feet from a District school building where an election is taking place. Dkt. 2-1, at 2.

In relevant part, Idaho Code § 18-2318 provides:

On the day of any primary, general or special election, no person may, within a *polling place*, or any building in which an election is being held, or within one hundred (100) feet thereof:
    (a) Do any electioneering;
    (b) Circulate cards or handbills of any kind;
    (c) Solicit signatures of any kind of petition; or
    (d) Engage in any practice which interferes with the freedom of voters to exercise their franchise or disrupts the administration of the polling place.

Idaho Code § 18-2318(1) (emphasis added).[2]

The parties dispute the meaning of "polling place" under § 18-2318. Plaintiffs argue "polling place" means the building where voting takes place. Defendant contends that when a polling place is a "public school facility," the definition of "polling place" is broader than the term "building" and encompasses "the physical plant of improved or unimproved real property owned or operated by a school district." Dkt. 9, at 5 (quoting Idaho Code § 33-804A). Based upon their differing interpretations, Defendant suggests it can prevent electioneering within 100 feet from the school grounds, while Plaintiffs argue Defendant can only prevent electioneering within 100 feet from the school building.

---

[2] Plaintiffs do not argue Idaho Code § 18-2318 is unconstitutional, and the Supreme Court has expressly held states may constitutionally carve out election day "campaign free zones." *Burson v. Freeman*, 504 U.S. 191, 211 (1992) ("A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect [the fundamental right to vote]," even when that right conflicts with the exercise of free speech.).

Although the parties devote large portions of their briefs to the proper interpretation of "polling place," the dispute is, for several reasons, immaterial to the instant Motion. First, Plaintiffs' request that the Court enjoin Defendant from stopping electioneering 101 or more feet from the building where voting takes place turns Idaho Code § 18-2318 on its head by implying that Plaintiffs have an unfettered right to electioneer on school properties within the District as long as they are more than 100 feet from the building where voting takes place. Section 18-2318, however, does not mandate that electioneering *must* be allowed if it is more than 100 feet from the polling place. Plaintiffs' contention that Defendant "<u>openly</u> violat[ed] Idaho Code § 18-2318" by not allowing them to electioneer more than 100 feet from the polling place is a fundamental misinterpretation of the statute. Dkt. 2-1, at 1 (emphasis added).

As discussed more fully below, Plaintiffs' position is also contrary to First Amendment law. "Just because certain types of speech are expressly prohibited within a certain area does not mean that they are therefore permissible outside that area." *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 749 (6th Cir. 2004) (hereinafter "*Sidney*"). Further—at least on the current record—schools within the District are either a nonpublic or limited public forum on election day and can limit expression on school grounds regardless of whether or not such expression occurs 100 feet from the polling place if they have a reasonable and viewpoint neutral reason to do so. Thus, even if the Court agreed with Plaintiffs that "polling place" means the building where voting takes place, and not the school grounds, Plaintiffs are not entitled to the injunctive relief they seek.

MEMORANDUM DECISION AND ORDER - 6

Second, there is no evidence to support Plaintiffs' claim that Defendant used Idaho Code § 18-2318 as a pretext to engage in viewpoint discrimination, or that Defendant even asked Plaintiffs to move because there were purportedly violating § 18-2318. Instead, all of the testimony at the evidentiary hearing confirmed that Plaintiffs were asked to move out of the parking lot because Pica and Keck believed they were impeding traffic and taking up parking spaces. Dkt. 20 at 65:3–22; 66:15–22; 68:1–16; 75:8–10; 76:5–6; 77:20–22; 86:21–24; 87:2–22; 89:8–20; 92:5–14; 94:1–21; 103:6–18; 111:9–11. Even if Pica and Keck were mistaken and Plaintiffs were not obstructing traffic or taking up parking spaces, Plaintiffs do not claim that any other groups *were* allowed to electioneer on school property on election day. Although Plaintiffs cite examples of Defendant's purported viewpoint discrimination—at other schools within the District and on non-election days—the Plaintiffs do not provide any evidence to support their claim that Defendant, "under the explicit direction of [Keck] . . . attempted to use law enforcement to drive certain ideas out of the marketplace" on November 3, 2020. Dkt. 2-1, at 3. Plaintiffs' Motion seeks relief solely with respect to election-day activities. Defendant's alleged viewpoint discrimination on other days is irrelevant to Plaintiffs' requested relief. Dkt. 2.

And third, Defendant did not stop Plaintiffs from electioneering within 100 feet of school grounds. While Plaintiffs claim  they were forcibly ejected from school property by law enforcement, all of the witnesses at the evidentiary hearing confirmed that Plaintiffs were asked to move out of Hayden Meadows' parking lot, but were permitted to, and did, continue handing out sample ballots off school property, but within 5–30 feet of the parking lot. Dkt. 20 at 57:3–5; 69:2–10; 72:1–9; 90:21–25; 91:17–22; 104:14–24; 107:9–18; *see*

MEMORANDUM DECISION AND ORDER - 7

*also* Dkt. 2-2, ¶ 7. If, as Plaintiffs contend, the parking spot where they were initially electioneering was 101 feet from the building where voting took place, then 5–30 feet away from this spot—even if not on school property—would still be within 100 feet of the school grounds. Dkt. 2-1, at 2. Said another way, Plaintiffs were not asked to move 100 feet from school property to electioneer, but were instead allowed to electioneer *within* 100 feet from school grounds. Even if Defendant's definition of "polling place" is incorrect, there is currently no evidence that they enforced it. For purposes of the instant Motion, Defendant's purportedly erroneous interpretation of "polling place" is,  accordingly, immaterial.

The Court next turns to factors Plaintiffs must meet to prevail on their Motion as outlined in *Winter*.

### A.  Likelihood of Success on the Merits

Demonstrating a likelihood of success on the merits, or  "serious questions going to the merits," is the most important element of a preliminary injunction. *Disney Enterprises., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). If the moving party cannot establish this element, a court need not consider the other three factors. *Id.* Here, the Court finds Plaintiffs have not established either a likelihood of success on the merits, or serious questions going to the merits, and their Motion, accordingly, fails.

### 1.  First Amendment Claim

The First Amendment prohibits the government from "abridging the freedom of speech" and guarantees "the right of the people peaceably to assemble." U.S. Const. amend. I. The First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for*

*Krishna Consciousness*, 452 U.S. 640, 647 (1981) (citations omitted). Instead, the government violates an individual's free speech rights when it restricts constitutionally protected speech without sufficient justification for the restriction. *Frisby v. Schultz*, 487 U.S. 474, 479–81 (1988).

To determine whether Defendant infringed Plaintiffs' First Amendment rights, the Court must consider: (1) whether Plaintiffs' speech is protected speech; (2) the nature of the relevant forum; and (3) "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

a. <u>Nature of the Speech</u>

There is no dispute that the oral and written dissemination of the Plaintiffs' political views is protected by the First Amendment. Indeed, the speech in which Plaintiffs engaged—handing out sample ballots and election materials in the advocacy of their political party—is the essence of First Amendment expression. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (citations omitted). But "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius*, 473 U.S. at 799. Because the Government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," the Supreme Court has adopted a "forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Id.* at 800 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)).

MEMORANDUM DECISION AND ORDER - 9

b.  Nature of the Forum

In assessing a First Amendment claim for speech on government property, the Court must identify the nature of the forum, because "the existence of a right of access to public property and the standard by which limitations upon such right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). The Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius*, 473 U.S. at 802.

Traditional public forums are those places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 473 U.S. at 45. Public parks and streets fall into this category. *Id*. (citing *Hague v. CIO*, 307 U.S. 496, 515 (1939)). Regulation of speech "on government property that has traditionally been available for public expression is subject to highest scrutiny." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("*Lee*"). "Such regulations survive only if they are narrowly drawn to achieve a compelling state interest." *Id.* (citing *Perry*, 460 U.S. at 45).

A second category of fora is the designated public forum, which exists where the government "intentionally opens up a nontraditional forum for public discourse." *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (citations omitted). In a designated public forum, restrictions on activity are, like those in a traditional public forum, subject to strict scrutiny. *Lee*, 505 U.S. at 678.

Although "all remaining public property is classified as nonpublic fora," the Supreme Court has also recognized an additional type of fora that shares features of both

public and nonpublic spaces: the "limited public forum." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999) (citations omitted). A limited public forum is a nonpublic forum that the government has intentionally opened to certain groups or to certain topics. *Id.*; *see also New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 n. 2 (2d Cir. 1998) (explaining a limited public forum arises when the government "opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.").[3] In both nonpublic fora and limited public fora, the government may limit expressive activity if the limitation is reasonable and viewpoint neutral. *DiLoreto*, 196 F.3d at 965.

Plaintiffs ask the Court to enjoin the District from preventing Plaintiffs from engaging in electioneering activities more than 100 feet from polling place buildings on school grounds on election day. Dkt. 2. "[P]ublic schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public

---

[3] Different circuits refer to "limited public forums" as either a subset of the designated public forum, as a subset of the nonpublic forum, or use the terms "designated public forum" and "limited public forum" interchangeably. *Hopper*, 241 F.3d at 1074; *see also Sidney,* 364 F.3d at 750 n. 3. In the Ninth Circuit, the terms are not the same. As the *Hopper* Court explained:

> [T]he fact that the government has opened a nonpublic forum to expressive activity does not determine whether we must apply strict scrutiny or the lower reasonableness standard. Rather, we must examine the terms on which the forum operates to determine whether it is a designated public forum or a limited public forum. If a forum is a "designated public forum," we apply strict scrutiny. But if it is merely a "limited public forum," then we apply the reasonableness test.

*Hopper*, 241 F.3d at 1075. This categorization "admittedly leads to the strange semantic result that a limited public forum is *not* actually a public forum," and is subject to a reasonableness test rather than strict scrutiny. *Id.* at 1075 n. 8 (emphasis in original).

MEMORANDUM DECISION AND ORDER - 11

questions.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (quoting *Hague*, 307 U.S. at 515). As such, public schools are not deemed public forums unless "the school authorities have by policy or practice opened those facilities for indiscriminate use by the general public, or by some segment of the public, such as student organizations." *Hazelwood*, 484 U.S. at 267 (cleaned up). If a school has instead been reserved for other intended purposes, "communicative or otherwise," then a public forum has not been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the community. *Id.* (quoting *Perry*, 460 U.S. at 46 n. 7).

The parties agree school buildings within the District are a limited public forum on election day. Dkt. 9, at 8; Dkt. 20, at 6:11–14 ("[W]e are not here to suggest that a school and the school district that controls that school is not a limited public forum. That is to say, it is a limited public forum. We understand that."). However, forum analysis is not completed merely by identifying the government property at issue. *Cornelius*, 473 U.S. at 801. Rather, in defining the forum, the Court must focus on the access sought by the speaker. *Id.* ("When speakers seek general access to public property, the forum encompasses that property."). Where, as here, more limited access is sought, courts must take a "more tailored approach to ascertain[] the perimeters of a forum within the confines of the government property." *Id.* (citations omitted).

Plaintiffs do not seek general access to District school properties, but instead seek more limited access on election day to areas on District school grounds that are more than 100 feet from the building where voting takes place. Dkt. 2. Although Plaintiffs do not

MEMORANDUM DECISION AND ORDER - 12

specifically so state, they appear to contend such areas are designated public forums.[4] *See, e.g.*, Dkt. 2-1, at 4 (contending the District must have a compelling government interest to "throw[] the Plaintiffs off school grounds on election day" and must use "the least restrictive means" to do so). Plaintiffs do not limit their request for injunctive relief to a specific school or to a specific area on District school properties, but instead broadly ask the Court to enjoin Defendant from preventing "Plaintiffs from engaging in electioneering efforts more than 100 feet from polling place buildings on election day on school grounds[.]" Dkt. 2, at 1.

As noted, public schools are not traditional public forums, and the government does not create a designated public forum "by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. Although schools "*may* create a public forum" or a designated public forum, *Hazelwood* also "constrain[s] the analysis by requiring that courts focus on the unique attributes of the school environment and recognize broadly articulated purposes for which [public] school facilities may be properly reserved." *Planned Parenthood of S. Nevada, Inc. v. Clark Cty. Sch. Dist.*, 941 F.2d 817, 825 (9th Cir. 1991) (emphasis in original) (citing *Hazelwood*, 484 U.S. at 270–73).

Here, Hayden Meadows' principal, Lisa Pica, testified that the school has approximately 350 elementary students and 50-55 teachers. Dkt. 20, at 60:1–12. On

---

[4] In fact, Plaintiffs do not engage in a forum analysis at all, and instead contend Defendant has engaged in unlawful viewpoint discrimination. *See generally* Dkt. 2-1. As explained below, Plaintiffs' allegations regarding viewpoint discrimination are irrelevant to the instant Motion.

election day, school was in session from 9:00 a.m. until 3:30 p.m. *Id.* at 60:15–61:4. Presumably, other schools within the District were also in session on Tuesday, November 3, 2020. That schools within the District are primarily used to educate children on election day is inconsistent with an intent to designate the school grounds as a public forum. "In cases where the principal function of the property would be disrupted by expressive activity, the [Supreme Court] is particularly reluctant to hold that the government intended to designate a public forum." *Cornelius*, 473 U.S. at 804.

Plaintiffs imply that the presence of the polling places affected the character of the school property that surrounded them. They argue "the power of the school district bends entirely to the authority of the state to control its elections process," and, as such, the District possesses "ZERO authority" to regulate speech in areas more than 100 feet from school buildings where voting takes place. Dkt. 22, at 3 (emphasis in original). Plaintiffs also contend "§ 18-2318 explains where members of the public may stand to legally electioneer in relation to those voting booths. . . . The legislature never would have permitted a school district to have veto power over the 1st Amendment rights of voters." Dkt. 10, at 8. Plaintiffs have not cited, and the Court has not located, any Idaho cases to support this broad reading of Idaho Code § 18-2318. Further, both Idaho law and First Amendment principals contradict Plaintiffs' position.

Although Idaho law makes it an offense to electioneer within 100 feet from the polling place, it does not follow that electioneering is automatically permitted more than 100 feet from a polling place. As noted, the fact that certain types of speech are prohibited within a certain area does not mean that they are permissible outside that area. *Sidney*, 364

F.3d at 749. Moreover, Idaho law expressly empowers the board of trusties of each school district to remove "from each schoolhouse or *school grounds* . . . any individual or individuals who disrupt the educational processes or whose presence is detrimental to the morals, health safety, academic learning, or discipline of the pupils." Idaho Code § 33-512(11) (emphasis added). The latter statute illustrates both the Idaho legislature's position on the power of school districts to ensure the educational process is not disrupted, and an important aspect of the relevant forum: First Amendment rights are not limitless on school property because schools have "the authority . . . and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property" and that they do not engage in disruptive or "threatening conduct that disturbs the tranquility of schools." *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999); *see also Clark*, 941 F.2d at 825.

Moreover, it was the state of Idaho, not school officials, that opened schools within the District as polling places to registered voters for the limited purpose of voting. This action by the state of Idaho, pursuant to Idaho Code § 34-302, did not turn the rest of school property into a designated public forum. *See Embry v. Lewis*, 215 F.3d 884, 888 (8th Cir. 2000) (holding the fact that the school was opened as a polling place under Missouri law did not turn the rest of school property into a designated public forum); *Sidney*, 364 F.3d at 749 ("By opening up portions of school and private property for use as polling places on election day, Ohio has not opened up a nontraditional forum for public discourse.").

There is no evidence in the current record to indicate Defendant, by policy or practice, opened up all areas on school grounds more than 100 feet from the building where voting takes place for public discourse merely by using school buildings as polling places

MEMORANDUM DECISION AND ORDER - 15

on election day. In fact, there is no evidence in the record to suggest the District has opened such areas—including Hayden Meadows' parking lot—for discourse of any sort on election day. Plaintiffs do not argue other political groups—or any other organizations or speakers—were, or have been, permitted to express themselves on school property on election day. Other than educational activities, the only expressive activity permitted on District properties on election day appears to have been "each voter's communication of his own elective choice[,] and this has long been carried out privately—by secret ballot in a restricted space." *See Marlin v. Dist. of Columbia Bd. of Elections & Ethics*, 236 F.3d 716, 719 (D.C. Cir. 2001) (holding that the interiors of polling places are nonpublic forums).

Plaintiffs also broadly suggest Defendant "opened the forum when they allowed other political points of view on their campus" at other times.  Dkt. 2-1, at 4. In support, Plaintiffs submitted two declarations, one from Plaintiff Jeff Tyler, and another from a former District board member, Terry Seymour. Dkt. 2-3; Dkt. 2-4. In his declaration, Tyler contends an unnamed Board Member acknowledged Reclaim Idaho—a liberal organization —"had a signature table at a negotiation meeting at Woodland Middle School at the entrance." Dkt. 2-3, ¶¶ 3, 5 (emphasis in original). Even if this claim was not unsubstantiated hearsay, Plaintiffs do not identify any details regarding when the negotiation meeting occurred. For instance, was it in 2020? Did it occur after school hours? Was it on election day? Were other political groups also permitted on campus during the negotiation meeting? Were District elementary schools in general, or Hayden Meadows in particular, ever opened to political or other speech? The barebones allegations in Tyler's

affidavit—even if credited—do not give the Court context to assess whether Hayden Meadows is a designated public forum.

In her affidavit, Seymour contends that between 2011 and 2015, she "witnessed many situations in which District 271 was used as a platform for certain political activities and on more than one occasion, I asked that those political activities be stopped. They were not." Dkt. 2-4, ¶ 3. However, none of the events Seymour recounts appear to have any connection to Plaintiffs, to Hayden Meadows, or to election day.[5] Plaintiffs seem to believe that if one school in the District allowed political expression at any time in the past, all District school property outside of the campaign-free zone is a designated public forum on election day. They fail to appreciate that forum analysis is decidedly more nuanced. Moreover, even if schools within the District were a designated public forum at one time, "the government may decide to close a designated public forum." *Johnson v. Perry*, 859 F.3d 156, 172 (2d Cir. 2017) (citation omitted); *Cornelius*, 473 U.S. at 802 ("Of course, the government is not required to indefinitely retain the open character of the facility") (cleaned up). Thus, the events Tyler and Seymour describe do not mean Defendant intentionally opened all areas on school grounds more than 100 feet from the building where voting takes place for public discourse on November 3, 2020.

Although Plaintiffs submitted two vague declarations to suggest the District has allowed certain political speech—in unidentified areas of other schools at unidentified

---

[5] Seymour's affidavit also has a number of other evidentiary defects, as she does not establish personal knowledge with respect to the events described in paragraphs 5–8; the events described in paragraphs 6 and 8 are also based on hearsay; and the events described in paragraphs 5, 6, and 7 are also based on Seymour's assumptions about people's actions. Dkt. 2-4.

times—they have not set forth any argument or evidence to suggest the District has designated Hayden Meadows' parking lot—the specific area where they sought to electioneer—as a public forum for purposes of political or other speech.

More broadly, in the absence of any evidence that the District intentionally opened its school grounds to certain groups or topics on election day, the Court concludes the areas where Plaintiffs seek to electioneer in their requested injunction—although more than 100 feet from school buildings where voting takes place—are either a non-public forum, or, at the very least, are a limited public forum. *Sidney*, 364 F.3d at 750 ("[W]e conclude that the parking lots and walkways leading to the polling places are nonpublic forums, with no different status than the remaining areas on school and private property."); *DiLoreto*, 196 F.3d at 967 (finding school baseball field fence was a limited public forum where there was no evidence the school intended to designate the fence as public forum for expressive activity); *Zeyen v. Pocatello/Chubbuck Sch. Dist. #25*, 4:16-cv-00458-DCN, 2018 WL 2224053, at *8 (D. Idaho 2018) ("[W]hen used as a polling place, the School District's property is a limited public forum[.]").

c.   Justification for the Exclusion

"[F]or the period in which the government elects to keep open the limited public forum, any subject-matter or speaker-based limitations must . . . be reasonable and viewpoint neutral." *Seattle Mideast Awareness Campaign v. King Cty.*, 781 F.3d 489, 499 (9th Cir. 2015). As noted, Plaintiffs have not presented any evidence to suggest the District's exclusion of Plaintiffs from the school property was *not* viewpoint neutral. Plaintiffs do not allege other political groups or members of the public were allowed to

electioneer on school grounds on election day when they were not. Nor is there any evidence that Plaintiffs were asked to move out of the Hayden Meadows parking lot because they were associated with the Republican Party. Critically, both Pica and Keck testified that they did not know who Plaintiffs were or what they were distributing when they told Franssen to ask Plaintiffs to move out of the parking lot. Dkt. 20, at 65:17–22, 68:20–25, 90:2–8. Indeed, Plaintiffs conceded during the evidentiary hearing that their allegations regarding viewpoint discrimination are irrelevant to their request for injunctive relief. *Id.* at 27:16–25 .

The Court thus turns to whether the District's limitation on Plaintiffs' speech was reasonable. The reasonableness of the government's restriction on access to a limited public forum must be assessed in light of the purpose of the forum and all of the surrounding circumstances. *Cornelius*, 473 U.S. at 810. The District contends Plaintiffs were asked to move out of the parking lot because they were causing traffic to back-up and were taking parking spaces while parents dropped their children off for school. Dkt. 9, at 10. Keck explained in his declaration that Plaintiffs were asked to move because Plaintiffs were: (1) stopping cars that were coming into the parking lot and causing traffic to back up on the road; (2) disrupting parents who were attempting to drop their children off at school; (3) disrupting the educational process by making children late for school; and (4) taking up parking spots so there were few or no spots left for voters, or for parents or other caretakers. Dkt. 9-1, at ¶¶ 5–10.

During the evidentiary hearing, Pica testified that when she arrived at school on the morning of November 3, 2020, one of her staff members reported traffic was significantly

backing up, that there were people in the parking lot stopping drivers to hand out materials, and that there were also a few individuals who were taking up parking spots with lawn chairs and a cooler. Dkt. 20, at 65:3–8. Pica went outside to observe traffic and watched as people stopped next to Plaintiffs in the parking lot, rolled down their windows, and took the materials Plaintiffs handed them. *Id.* at :17–25. Pica saw parents were being stopped as they came around the corner into the parking lot, which was "backing up traffic quite a ways."[6] *Id.* at :9–13. Pica also noted Plaintiffs were taking up parking spaces for voters. *Id.* at 75:8–10.

Pica called Keck to see what she should do about the traffic. *Id.* at 67:1–2. At the time, Keck was viewing all of the District schools that were polling places via monitors. *Id.* at :4–11; 82:8–13. Keck testified he could see the entire road in front of Hayden Meadows and the entire parking lot, and viewed "an extremely full parking lot" and significant traffic. *Id.* at 87:2–16. Keck called the District's attorney and subsequently advised Pica the plan was to ask Plaintiffs to move "out of the parking spots to free [them up] for vehicles and then not to stop cars as they were coming in with parents and kids so they wouldn't be late for school." *Id.* at 89:8–11.

Keck explained he asked Franssen to move Plaintiffs out of the parking lot to a grass area about 10 feet away. *Id.* at 89:15–20. When questioned why he asked Franssen to move Plaintiffs out of the parking lot, Keck stated:

> Number one was to free up the parking spot for other vehicles. Again, it could be teachers coming in or parents coming in or it could have been other voters.

---

[6] On cross-examination, Pica clarified that she could not tell whether Plaintiffs were stopping the drivers or whether the drivers were instead stopping (of their own volition) to talk to Plaintiffs. *Id.* at 75:11–22.

> Hayden Meadows is a pretty small parking lot, so there's not a lot of space, and there were cars already that were . . . blocking a lot of traffic. So we needed all the parking spots we could. So that was the main purpose, and the other was to not block traffic so the kids wouldn't be late for school.

*Id.* at 92:7–14; *see also* Dkt. 9-1, at ¶ 5–7.

Franssen testified he understood Pica and Keck wanted Plaintiffs to move out of the parking lot because they were "affecting traffic and . . . there was concern that if one person was doing it, then lots of people would start doing it and there could be potential safety hazards or problems in the parking lot." *Id.* at 103:14–18. Franssen explained he asked Plaintiffs to leave the parking lot but told them they could move to the grassy area approximately 20 to 30 feet away from where they were standing. *Id.* at 104:15–24. When he approached Plaintiffs, Franssen could see they were passing out Republican sample ballots and that they were affiliated with the Republican Party. *Id.* at 105:3–14. Franssen attested the fact that Plaintiffs were passing out Republican ballots was "absolutely not" the reason they were asked to leave school property. *Id.* at :15–17.

Pica, Keck, and Franssen each testified that there were no further problems with traffic on election day after Plaintiffs were asked to move out of the parking lot. *Id.* at 76:17–21, 91:12–15, 111:9–15. Plaintiffs' witness, election constable Hamilton, confirmed drivers stopped their cars to obtain materials from Plaintiffs during the morning drop-off. *Id.* at 52:19–23, 53:4–12. However, Hamilton testified that moving Plaintiffs out of the parking lot actually made traffic worse because cars stopped in front of the grass area to get materials from Plaintiffs and blocked the entrance to the parking lot once Plaintiffs moved, while, when Plaintiffs were in the parking lot, "cars could still enter the parking lot

and get around them just fine without any troubles at all." *Id.* at 113:14–19. The dispute is immaterial because regardless of whether moving Plaintiffs actually helped traffic, it is undisputed that Keck and Pica asked Franssen to move Plaintiffs out of the parking lot because they were stopping traffic, were taking parking spots needed for voters and parents, and were potentially disrupting the educational process by causing kids to be late to school. Each of these concerns was reasonable and had nothing to do with the content of Plaintiffs' speech or their political affiliation.

Under such circumstances, the decision to exclude Plaintiffs from electioneering in the parking lot was reasonable and viewpoint neutral. "The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt [a limited public forum] and hinder its effectiveness for its intended purposes." *Cornelius*, 473 U.S. at 810. As such, the Court cannot enjoin Defendant from preventing Plaintiffs or others from engaging in electioneering efforts more than 100 feet from school polling place buildings on election day. As a limited public forum, the District may lawfully exclude Plaintiffs or others from school grounds on election day as long as it has a reasonable and viewpoint neutral reason for doing so.

## 2. Equal Protection Claim

Plaintiffs also allege Defendant violated their right to Equal Protection under the Fourteenth Amendment. "The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Although Plaintiffs did not brief their

likelihood of success on the merits of their Equal Protection claim, the Court finds the claim is not likely to succeed at this juncture.

If the Court does not enjoin the District from preventing Plaintiffs from electioneering more than 100 feet from a school building where voting takes place, Plaintiffs claim that homeowners who live within 100 feet from school facilities will be deprived of their right to equal protection because they may be arrested or fined under Idaho Code § 18-2318(3) for displaying political signs in their yards, while homeowners who live outside this boundary will not. Dkt. 2-1, at 5. Plaintiffs also argue voters will be deprived of equal protection because they will have to cast votes with varying amounts of information depending on their precinct. *Id.* That is, voters who are assigned to school polling places will not have access to sample ballots more than 100 feet from school grounds while voters who are assigned to church buildings or other polling places will have access to sample ballots within this boundary.[7]

Assuming, *arguendo*, that either of these harms would constitute an Equal Protection violation, Plaintiffs have not illustrated they have standing to raise them. The "irreducible constitutional minimum" of Article III standing consists of three elements: (1) the plaintiff must have suffered an injury in fact[8] (2) that is fairly traceable to the challenged conduct of the defendant and not the result of the independent action of some third party

---

[7] In their Complaint, Plaintiffs also allege Defendant's policies and actions are unconstitutional abridgments of Plaintiffs' right to equal protection because they are not facially neutral and specifically target Plaintiffs' viewpoints and speech. Dkt. 1, at ¶¶ 50–52, 54–58. Because there is no evidence that Defendant engaged in viewpoint discrimination on election day, Plaintiffs' allegations regarding their equal protection rights are not relevant to the injunctive relief they seek.

[8] An "injury in fact" is an invasion of a legally protected interest which is concrete and particularized and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up).

not before the court and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). When moving for a preliminary injunction, a party must make "a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). Article III standing "is also claim- and relief-specific, such that a plaintiff must establish Article III standing for each of her claims and for each form of relief sought." *In re Adobe Systems, Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1218 (N.D. Cal. 2013) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

The Equal Protection clause confers "standing only to those persons who are personally denied equal treatment" and the "Supreme Court has repeatedly refused to recognize a generalized grievance against allegedly illegal government conduct as sufficient to confer standing." *Carroll v. Nakatani*, 342 F.3d 934, 940 (9th Cir. 2003) (citing *United States v. Hays*, 515 U.S. 737, 743 (1995)). None of the Plaintiffs have alleged that they own homes within 100 feet of District school grounds.[9] Nor have they alleged that they vote at District polling places. Although Plaintiffs may potentially seek leave to amend to address this deficiency, they have not shown they have standing with respect to the Equal Protection violations they allege in their Motion. As such, Plaintiffs have not established a likelihood of success on the merits of their Equal Protection claim with respect to their request for injunctive relief.

---

[9] Plaintiff Kootenai County Republican Central Committee also does not allege that any of its members have homes within 100 feet from District School grounds or vote at District polling places.

### 3.   Conclusion

Plaintiffs have not established either a likelihood of success on the merits or "serious questions going to the merits" with respect to their requested relief and their Motion is appropriately denied on this basis alone. *Disney Enter.*, 869 F.3d at 856. Nevertheless, the Court briefly discusses Plaintiffs' showing with respect to the other elements required for injunctive relief.

### B.   Likelihood of Irreparable Injury

Plaintiffs have not shown a likelihood of irreparable injury absent a preliminary injunction. Even under the sliding scale approach, a party may not obtain a "preliminary injunction unless they can show that irreparable harm is *likely* to result in the absence of the injunction." *All for the Wild Rockies*, 632 F.3d at 1135 (emphasis added). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek*, 520 U.S. at 972). Plaintiffs' assertion that they will suffer irreparable harm in the absence of an injunction is unconvincing.

As noted, Plaintiffs speculate that if the injunction is not granted, they, along with other voters, will face criminal penalties for displaying signs in their yards and will have to cast votes with varying levels of information depending on their precinct. Although these considerations may be proper with respect to the public interest analysis of an injunction, they have no bearing on Plaintiffs and their likelihood of suffering irreparable harm. At this time, Plaintiffs cannot assert harms for non-parties because they have not established

standing to do so. *Winter*, 555 U.S. at 22 (explaining a party seeking a preliminary injunction must demonstrate that in the absence of a preliminary injunction, "the *applicant* is likely to suffer irreparable harm") (emphasis added) (citation omitted); *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) ("At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm.").

And, even if Plaintiffs had demonstrated that they have standing to raise their alleged harms, such harms are entirely speculative. Despite implying that the District will use Idaho Code § 18-2318 to bar electioneering within 100 feet from school grounds, Plaintiffs have not offered any evidence that the District has done so in the past or actively intends to do so in the future. In fact, it is undisputed that Plaintiffs were allowed to electioneer within 100 feet from the school grounds, and voters were able to obtain sample ballots from Brooke during the November 3, 2021 election, even though Brooke and others were asked to move out of Hayden Meadows' parking lot. Plaintiffs have also not cited any instances where a homeowner living within 100 feet of school grounds was barred from displaying political signs, or any examples of voters being unable to obtain sample ballots or other election materials by virtue of living in a District polling place precinct.

Further, as the District highlights, Idaho Code § 18-2318 prohibits a person from *doing* any electioneering, *circulating* cards or handbills of any kind, *soliciting* signatures to any kind of petition, *engaging* in any practice which interferes with the freedom of voters to exercise their franchise, *disrupting* the administration of the polling place, *obstructing* the doors or entries to a building or polling place, or *preventing* free access to and from

any polling place. Idaho Code  § 18-2318 (emphasis added). Section 18-2318 does not appear to prevent passive conduct, like displaying a yard sign, but is instead aimed at preventing affirmative actions by individuals who have the potential to intimidate voters, to disrupt the integrity of the voting process, and to infringe upon voters' rights to cast their ballots free from interference. *Id.* Thus, even if not entirely speculative, Plaintiffs' alleged harms also conflict with the intent of the statute. While Plaintiffs seemingly believe that Idaho Code § 18-2318 is meant to protect their right to electioneer 101 feet or more from the polling place, the language of the statute instead illustrates that it is meant to protect voters from interference.

In short, Plaintiffs have not established a likelihood of irreparable harm in the absence of their requested injunction.

### C.    Balance of Equities and Public Interest

The balance of equities and public interest also weigh against the relief Plaintiffs seek. When balancing the equities, the court should "balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (cleaned up). However, when the government is a party, the balance of the equities and the public interest merge. *Id.*

Here, the harm the requested injunction would cause the District is not speculative

MEMORANDUM DECISION AND ORDER - 27

and is illustrated by the events that occurred on November 3, 2020. Plaintiffs assumed Idaho Code § 18-2318 gave them the unfettered right to electioneer anywhere on school grounds more than 100 feet from the building where voting took place. In occupying the parking lot, Plaintiffs took parking places for parents, teachers, and voters, caused traffic to stop and back-up—which made kids late for school—and ultimately disrupted the educational process. Granting the injunctive relief Plaintiffs seek would prevent the District from stopping similar—or much more severe—disruptions to the educational process on election day. The interest children have in a safe, peaceful educational environment outweighs the potentially minimal harm to landowners, electioneers, and voters of having to promote certain causes and candidates off school property on election day. Simply put, the equities and public interest in this case weigh against the relief Plaintiffs seek.

## V. CONCLUSION

On the current record, Defendant's decision to exclude Plaintiffs from electioneering in Hayden Meadows' parking lot was viewpoint neutral and reasonable, and Plaintiffs free speech rights were not violated when they were denied access to this limited public forum. While this holding does not foreclose Plaintiffs from illustrating Defendant has violated their First Amendment or Equal Protection rights at trial, Plaintiffs are still not entitled to the injunctive relief they seek. As the Court's analysis illustrates, the right to free speech depends upon both the nature of the forum and the extent of disruption that might be caused by the speaker's activities. *Cornelius*, 473 U.S. at 799–800. This assessment is context-specific, and cannot be undertaken with respect to every location on school property, at every school building within the District, and at all times during election

day, as the Plaintiffs request. Plaintiffs broadly ask the Court to essentially mandate that they are always entitled to electioneer on school property on election day, regardless of the disruption such electioneering may cause, as long as they remain outside of the campaign-free zone. Plaintiffs are not entitled to such relief. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.*

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. Plaintiffs' Motion for Preliminary and Permanent Injunction (Dkt. 2) is **DENIED**.

DATED: October 20, 2021

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 29